2012 WY 57

**Hailey Jacobsen REMMICK, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–11–0015.**

Supreme Court of Wyoming.

April 11, 2012.

Representing Appellant: Diane M. Lozano, State Public Defender; Tina N. Olson, Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Mr. Alden.

Representing Appellee: Bruce Salzburg, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Meri V. Geringer, Senior Assistant Attorney General. Argument by Ms. Geringer.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1] Appellant, Hailey Jacobsen Remmick, challenges her conviction of six counts of receiving stolen property and one charge of conspiracy to commit larceny by a bailee. Ms. Remmick claims that pre-charging delay deprived her of due process of law and that there was insufficient evidence to support the jury's verdict. We affirm.

### ISSUES

[¶ 2]   Ms. Remmick presents two issues:

1.  Was Appellant denied due process of law by pre-charging delay?

2. Was the jury verdict supported by sufficient evidence?

## FACTS

[¶ 3] The charges against Ms. Remmick stemmed from actions taken by her mother, Julie Jacobsen, during 2002 and 2003. At that time, Ms. Jacobsen owned Better Bookkeeping and Accounting, which had a contract to perform bookkeeping duties for Fox Park Homeowners Association and Fox Park Service and Improvement District (Fox Park). The Fox Park entities were the governing and operating bodies of a trailer park subdivision in Gillette, Wyoming, and were overseen by a common Board of Directors (Board).

[¶ 4] As part of her duties, Ms. Jacobsen managed two bank accounts authorized by the Board, the money market account and the operating account. Money from tax assessments, state grants, and bank loans, as well as money earmarked for special improvements, was kept in the money market account. When payments from this account were authorized by the Board, Ms. Jacobsen filled out checks on this account and presented them for Board members' signatures. Two Board members' signatures were required on each check.

[¶ 5] On June 15, 2002, Ms. Jacobsen wrote a $3,000.00 check from the money market account to Ms. Remmick. The check on its face read "Fox Park" and bore the forged signatures of two Board members. Ms. Remmick accepted and endorsed the check. This check was the basis for Count I of the Information filed against Ms. Remmick.

[¶ 6] The operating account was funded through monthly dues paid by the Fox Park residents. This account was used to pay normal day-to-day operating expenses. Checks written on this account also had to bear the signatures of two Board members. When Ms. Jacobsen received Fox Park's bills at her business address, she filled out checks and presented them for Board members' signatures.

[¶ 7] On April 15, 2003, Ms. Jacobsen presented a check to her bank for $3,000.00, which she had written on the Fox Park operating account and made out to her business, Better Bookkeeping and Accounting. It bore the forged signatures of two Board members. Ms. Jacobsen kept $200.00 in cash and deposited the remaining $2,800.00 in her personal checking account.[1] That deposit increased her personal account balance from $334.23 to $3,134.23. On that same date, she wrote a $1,200.00 check to Ms. Remmick from that account. This check formed the basis for Count VII of the Information.

[¶ 8] Ms. Jacobsen also managed a third account, ostensibly in Fox Park's name. This account had not been authorized by the Board, and its members were unaware of its existence until law enforcement began investigating Ms. Jacobsen. Ms. Jacobsen was the only signatory on the unauthorized account, and she made various transfers of money from the Fox Park operating and money market accounts into this account. The checks for this account bore the name "Fox Park District."

[¶ 9] Ms. Jacobsen wrote four checks to Ms. Remmick from the unauthorized account: one on June 15, 2002, for $3,000.00 (Count II); one on January 21, 2003, for $1,200.00 (Count III); one on June 17, 2003, for $1,000.00 (Count IV); and one on November 4, 2002, for $300.00 (Count V). Each of the checks showed the name "Fox Park District" on the face of the check. Ms. Remmick endorsed the checks.

[¶ 10] On December 6, 2002, Ms. Jacobsen wrote a check for $2,600.00 to her business, Better Bookkeeping, from the unauthorized account. She deposited the check in her personal bank account, increasing her ledger balance from $1,714.50 to $4,314.50. This same day, she wrote a $2,000.00 check to Ms. Remmick from her personal account. Ms. Remmick endorsed that check. This check formed the basis for Count VI of the Information.

[¶ 11] In addition, on January 28, 2003, Ms. Jacobsen opened a $1,000.00 line of credit in Fox Park's name at Checker Auto Parts.

---

1. Although this is referred to as Ms. Jacobsen's personal account, Ms. Remmick was also an authorized signatory on this account, and had also used the account.

She did so without authorization from the Board. The list of authorized users of this account included Ms. Jacobsen, Ms. Remmick, Ms. Remmick's sister, and a friend. Ms. Remmick later used this charge account, charging $65.39 worth of items and signing her name to the sales receipt. The receipt identified the charge account holder as Fox Park. This transaction served, in part, as evidence of the conspiracy alleged in Count V against Ms. Remmick.[2]

[¶ 12] Campbell County law enforcement began investigating Ms. Jacobsen in late 2003, and eventually notified federal investigators and prosecutors of the results of their investigation. A federal grand jury indicted Ms. Jacobsen on July 13, 2005 on tax evasion charges, to which she pled guilty. The federal court sentenced her on August 25, 2006, to serve a period of incarceration of eighteen months, followed by three years of supervised probation. At the request of the U.S. Attorney's Office, the Campbell County Attorney's Office deferred prosecuting Ms. Jacobsen during the pendency of the federal case. Three months after Ms. Jacobsen was released from federal custody, the Campbell County Attorney's Office filed charges of forgery and larceny against her. On October 23, 2009, the jury returned guilty verdicts on all ten counts that had been brought against Ms. Jacobsen. She was not present in court when the verdict was received, however, apparently because she had absconded from the jurisdiction.

[¶ 13] Although the prosecution of Ms. Remmick stemmed from events that occurred between June, 2002 and June, 2003, the charges against her were not brought until October 28, 2009, after Ms. Jacobsen had been found guilty. On March 3, 2010, Ms. Remmick filed a Motion to Dismiss for Prearrest Delay as a Denial of Due Process. Her contention was that, because the State had delayed her prosecution until after her mother had left the jurisdiction, her mother was no longer available to assist her in preparing a defense. After a hearing, the district court denied the motion. Trial was originally scheduled for May, 2010. Ms. Remmick, however, filed a motion for continuance seeking additional time to prepare for trial. She also filed a Waiver of Speedy Trial. The motion was granted and trial was held in August, 2010. After a two-day trial, the jury found Ms. Remmick guilty on all counts.

[¶ 14] The court imposed terms of imprisonment of four to nine years on each count, to be served concurrently with one another and consecutively to one imposed in a separate criminal case. The court suspended the period of imprisonment in favor of nine years of supervised probation. Ms. Remmick filed this timely appeal.

## DISCUSSION

### Pre-Charging Delay

[¶ 15] In her first issue, Ms. Remmick claims that the delay in bringing charges against her resulted in an infringement of her due process rights. Because this is a claim involving constitutional rights, our review of the district court's decision is *de novo*. *Bush v. State*, 2008 WY 108, ¶ 72, 193 P.3d 203, 221 (Wyo.2008).

[¶ 16] In order to prevail on her claim, Ms. Remmick bears the burden of proving both "an intentional delay by the state to gain a tactical advantage over the accused and actual prejudice resulting from that delay." *Id.*, ¶ 73, 193 P.3d at 221; *Vernier v. State*, 909 P.2d 1344, 1348 (Wyo.1996). As we previously explained:

> Wyoming has no statute of limitations for criminal offenses, and prosecution for such offenses may be commenced at any time during the life of the offender. *Story v. State*, 721 P.2d 1020, 1026, 65 A.L.R.4th 1011 (Wyo.1986). However, when a delay in bringing charges results in prejudice to a defendant, due process considerations may arise. *Id.* at 1027; *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). In order to require dismissal of a charge, it is necessary that a preindictment delay cause

---

2. In the original information, the conspiracy charge (Count V) alleged a conspiracy to commit larceny by bailee extending from June 15, 2002 to June 18, 2003. During trial, the prosecution amended the conspiracy charge to include the Checker Auto Parts transaction.

"substantial prejudice to [appellant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *Story*, 721 P.2d at 1027, *quoting from United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971).

*Phillips v. State*, 835 P.2d 1062, 1069 (Wyo. 1992).

■ [¶ 17] To show prejudice, an appellant must demonstrate "the loss of a witness, exhibit or other evidence, the presence of which would probably bring a different result." *Id.*, 835 P.2d at 1069. We have made it clear that only "actual prejudice, not possible prejudice," will suffice to establish that a delay in prosecution resulted in a due process violation. Ms. Remmick has failed to satisfy that burden.

■ [¶ 18] Ms. Remmick bases her claim of prejudice on the fact that Ms. Jacobsen was not available to help Ms. Remmick prepare for trial. She argues that Ms. Jacobsen's participation was crucial because of her knowledge of the documents and transactions on which the charges were based. She also bases her claim on the fact that Ms. Jacobsen was unavailable to testify in Ms. Remmick's defense.

[¶ 19] We note initially that Ms. Remmick filed her motion to dismiss on March 3, 2010. After the motion was denied, Ms. Remmick requested and received a continuance, allowing her additional time to prepare for trial. Trial was not held until late August, 2010. She did not, and does not, claim that she needed additional time to prepare for trial in light of Ms. Jacobsen's absence. Although the State conceded that it did not know Ms. Jacobsen's whereabouts, Ms. Remmick never stated in her motion or at the hearing that she was unable to contact Ms. Jacobsen. In fact, there are indications that some family members were in contact with Ms. Jacobsen. During the motion hearing, the prosecution advised the court: "For the court's information Pete Deliramich, her husband, now ex-husband, was interviewed shortly after Ms. Jacobsen fled and admitted that he was in telephonic contact with her and declined to assist law enforcement in trying to track her down." Ms. Remmick never advised the court of any attempts she made to locate Ms. Jacobsen, and never sought a continuance for the purpose of trying to locate her mother and obtain her testimony or assistance in preparing her defense.

[¶ 20] Additionally, Ms. Remmick has not established that Ms. Jacobsen would have testified if available. We note that Ms. Jacobsen did not testify at her own trial, and had not yet been sentenced in that case. Further, Ms. Remmick does not specify how Ms. Jacobsen's testimony would have led to a different result in this case. Ms. Remmick has failed to identify any document, potential testimony, or other evidence of any kind that Ms. Jacobsen could have offered in her daughter's defense. Because Ms. Remmick has offered no more than speculation that Ms. Jacobsen's participation would have brought about a different result, we are not convinced that Ms. Remmick suffered any actual prejudice due to Ms. Jacobsen's absence.

[¶ 21] More significant, however, is Ms. Remmick's failure to prove that the State's delay in prosecuting her was an intentional effort to gain a tactical advantage over her. During the hearing, Ms. Remmick's defense counsel conceded that she could not "show what the prosecutor's motive was" or prove any "malevolent motive" on the part of the prosecution. On appeal, she asserts that the timing of the charges itself implies an improper motive. She points to "the precipitous filing of charges against [her] days after [her] mother absconded" and argues that "[t]his timing smacks of vicarious retaliation against mother."

[¶ 22] The prosecution, however, provided the district court with an alternative explanation for the delay in prosecuting Ms. Remmick. As set forth previously, the Campbell County Attorney's office deferred its prosecution of Ms. Jacobsen while the federal case was pending. State charges against Ms. Jacobsen were brought three months after she was released from federal custody. According to the State, it chose to prosecute Ms. Jacobsen before Ms. Remmick in order "to establish that there was indeed a case upon which to rest subsequent prosecutions, if

any." Once Ms. Jacobsen was found guilty on all charges, the prosecution proceeded promptly against Ms. Remmick.

[¶ 23] In addition, after Ms. Jacobsen did not appear in court for the jury's verdict, law enforcement executed a warrant to search her house, and found additional evidence that apparently assisted in the prosecution of Ms. Remmick. Charges were filed against Ms. Remmick the day after this search warrant was executed. There is no indication that the delay in bringing charges was motivated by an intentional effort to gain tactical advantage over Ms. Remmick. Accordingly, we conclude that the district court did not err in denying Ms. Remmick's motion to dismiss the charges.

### Sufficiency of the Evidence

[¶ 24] As her second issue, Ms. Remmick asserts that the evidence was insufficient to support the jury's guilty verdict on any of the charges.

> When reviewing a sufficiency of the evidence claim in a criminal case, we must determine whether a rational trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. We do not consider conflicting evidence presented by the unsuccessful party, and afford every favorable inference which may be reasonably and fairly drawn from the successful party's evidence. We have consistently held that it is the jury's responsibility to resolve conflicts in the evidence. We will not substitute our judgment for that of the jury [and] our only duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did.

*Breazeale v. State*, 2011 WY 10, ¶ 13, 245 P.3d 834, 839 (Wyo.2011), quoting *Masias v. State*, 2010 WY 81, ¶ 8, 233 P.3d 944, 947 (Wyo.2010).

[¶ 25] Ms. Remmick was convicted of six counts of receiving stolen property. At the time of the incidents giving rise to her prosecution, the applicable statute provided:

> (a) A person who buys, receives, conceals or disposes of property which he knows, believes or has reasonable cause to believe was obtained in violation of law is guilty of:
> (i) A felony punishable by imprisonment for not more than ten (10) years, a fine of not more than ten thousand dollars ($10,-000.00), or both, if the value of the property is five hundred dollars ($500.00) or more[.]

Wyo. Stat. Ann. § 6–3–403(a)(i) (LexisNexis 2003).[3] Ms. Remmick concedes that the evidence was sufficient to prove that Ms. Jacobsen obtained money from Fox Park in violation of law, and that Ms. Jacobsen transferred some of that money to Ms. Remmick. She contends, however, that there was insufficient evidence that she knew, believed, or had reasonable cause to believe that the money she received from her mother was obtained illegally.

[¶ 26] Ms. Remmick is correct that there was no direct evidence of her actual or imputed knowledge. However, we have previously observed that

> proof of guilty knowledge, like proof of intent, is rarely capable of establishment by direct evidence, [and, therefore] circumstantial evidence—independent facts from which an inference of the ultimate fact to be established may rationally be drawn in light of common experience—most often is the only manner of proof available.

*Russell v. State*, 583 P.2d 690, 700 (Wyo. 1978). Accordingly, "Guilty knowledge may be established by direct evidence, circumstantial evidence, or by both types of evidence." *Tageant v. State*, 673 P.2d 651, 654 (Wyo.1983).

[¶ 27] There was evidence that Ms. Remmick received money from Fox Park bank accounts when there was no reason for Fox Park to pay her any money. Ms. Remmick had never been employed by Fox Park, and there was no evidence that she had ever furnished goods or services to Fox Park. Yet five of the checks Ms. Remmick received were written on Fox Park bank accounts.

---

3. The legislature amended this statute in 2004, raising the $500.00 property value threshold to $1,000.00. 2004 Wyo. Sess. Laws ch. 126, § 1.

The fact that Ms. Remmick received illegally obtained money that she had no reason to receive was sufficient to allow the jury to infer that she had reason to believe that the money was obtained in violation of law.

[¶ 28] Two of the checks Ms. Remmick received were written on her mother's personal account. The timing and amounts of these two checks corresponded closely with deposits into that account of money Ms. Jacobsen had obtained illegally from Fox Park. For example, on December 6, 2002, Ms. Jacobsen wrote a check for $2,600.00 from the unauthorized Fox Park account to her accounting business. She deposited that check in her personal account, raising the balance from $1,714.50 to $4,314.50. That same day, she wrote a check from her personal account to Ms. Remmick for $2,000.00. As the prosecution pointed out, this check would have been returned for insufficient funds if Ms. Jacobsen had not made the deposit of the money obtained from Fox Park. The prosecution also presented evidence that Ms. Remmick was an authorized signatory on Ms. Jacobsen's personal bank account, that she had written a check to herself from that account, and that she had deposited a check into that account. Based on this evidence, the prosecution contended that Ms. Remmick had some knowledge of the deposits into and debits from Ms. Jacobsen's personal bank account, and in turn, some knowledge of the illegal source of those funds. The State admits that this evidence is not a "smoking gun" that, by itself, establishes Ms. Remmick's guilt. However, it forms a sufficient basis from which a jury could reasonably infer that Ms. Remmick knew or had reason to believe that the money she received from her mother had been obtained in violation of law. We conclude that the evidence was sufficient to support her convictions on the charges of receiving stolen property.

[¶ 29] Ms. Remmick was also convicted on one count of conspiracy to commit larceny by a bailee. The statute governing conspiracy provides that "A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons that they or one (1) or more of them will commit a crime and one (1) or more of them does an overt act to

effect the objective of the agreement." Wyo. Stat. Ann. § 6–1–303(a). Ms. Remmick admits that there was sufficient evidence for the jury to find that Ms. Jacobsen had done overt acts to effect larceny by a bailee, and that some of the money illegally obtained was given to Ms. Remmick. She contends, though, that there was a complete lack of evidence that she had entered into any agreement with her mother to commit any crime.

[¶ 30] For a conspiracy conviction to be sustained, "the evidence must show beyond a reasonable doubt that the parties to the conspiracy voluntarily agreed to commit an offense." *Martinez v. State*, 943 P.2d 1178, 1183 (Wyo.1997).

> In *Smith v. State*, 902 P.2d 1271 (Wyo. 1995), we considered what type of agreement was necessary for a conspiracy to exist.
>
>> "One might suppose that the agreement necessary for conspiracy is essentially like the agreement or 'meeting of the minds' which is critical to a contract, but this is not the case. Although there continues to exist some uncertainty as to the precise meaning of the word in the context of conspiracy, it is clear that the definition in this setting is somewhat more lax than elsewhere. A mere tacit understanding will suffice, and there need not be any written statement or even a speaking of words which expressly communicates agreement....
>>
>> Because most conspiracies are clandestine in nature, the prosec[u]tion is seldom able to present direct evidence of the agreement. Courts have been sympathetic to this problem, and it is thus well established that the prosecution may 'rely on inferences drawn from the course of conduct of the alleged conspirators.'"
>
> 902 P.2d at 1281–82 (quoting WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., CRIMINAL LAW at 460–61 (1972)).

*Martinez*, 943 P.2d at 1183.

[¶ 31] The conspiracy charge considered by the jury in Count V alleged that Ms. Remmick and her mother had conspired,

over a period of time from June 15, 2002 to June 26, 2003, to commit the crime of larceny by bailee against Fox Park. This time period began with the date of the first check Ms. Remmick had received from the Fox Park account, the check that formed the basis of Count I against Ms. Remmick. It included the dates of the other checks that formed the bases for Counts II, III, IV, VI, and VII against Ms. Remmick. It ended on the date that the State alleged Ms. Remmick had used the unauthorized Fox Park charge account that her mother had opened at the auto parts store. The evidence relating to the conspiracy charge included all of the evidence relating to the remaining six counts.

[¶ 32] In addition, evidence was presented in Ms. Remmick's trial that her mother opened a charge account in Fox Park's name at an auto parts store, and included Ms. Remmick as a signatory on the account. The account was not authorized by the Fox Park Board, and two of the directors testified that they were not aware of its existence. Not only was Ms. Remmick aware of the unauthorized charge account, but further, she used it. It is reasonable to infer that she could not have done so without an agreement with her mother, at least the tacit sort of agreement necessary to sustain a conspiracy charge. When we afford to the State the favorable inferences that may reasonably be drawn from the evidence, we conclude that there was sufficient evidence for a jury to find that there was an agreement between Ms. Remmick and Ms. Jacobsen, and on that basis to convict Ms. Remmick of conspiracy to commit larceny by a bailee.

[¶ 33] Affirmed.